CHEBOYGAN SPORTSMAN CLUB V CHEBOYGAN COUNTY
PROSECUTING ATTORNEY

Docket No. 313902. Submitted March 12, 2014, at Lansing. Decided
    October 2, 2014, at 9:05 a.m.

   The Cheboygan Sportsman Club brought an action in the Cheboygan
   Circuit Court, seeking a declaratory judgment that would preclude
   the Cheboygan County Prosecuting Attorney from enforcing the
   statutory prohibition against discharging a firearm within 150
   yards of an occupied building without written permission, cur-
   rently codified at MCL 324.40111(6), against plaintiff's shooting
   range on the ground that that provision, read in context, applied
   only to hunters. Both parties moved for summary disposition. The
   National Rifle Association filed a brief amicus curiae arguing that
   if MCL 324.40111 applied, plaintiff was entitled to immunity from
   civil suit under the sport shooting ranges act, MCL 691.1541 *et
   seq.* On this basis, the court, Scott L. Pavlich, J., granted
   plaintiff's motion for summary disposition, denied defendant's
   motion for summary disposition, and granted plaintiff's request
   for a declaratory judgment, ruling that MCL 691.1542 was
   incompatible with MCL 324.40111 and that MCL 691.1542,
   being later enacted and more specific, controlled. Defendant
   appealed.

       The Court of Appeals *held*:

       1. The trial court erred by applying the sport shooting
   ranges act. Although the act gives shooting ranges immunity
   from civil liability or criminal prosecution in matters relating to
   noise or noise pollution, actions for nuisance, and injunctions
   based on noise or noise pollution under certain circumstances,
   the threatened criminal liability in the instant matter had
   nothing to do with noise or nuisance. Further, while the act
   provides immunity to shooting ranges for violation of ordi-
   nances under some circumstances, the threatened criminal
   liability in this case involved violation of a statute. Moreover,
   the threat of prosecution was to plaintiff's members, not to
   plaintiff itself.

       2. The trial court reached the correct result, albeit for the
   wrong reason, because MCL 324.40111(6), when read in context

and considering its legislative history, applies to hunting and not to shooting ranges.

Affirmed.

Judge WHITBECK, concurring in part and dissenting in part, agreed that the trial court erred by applying the sport shooting ranges act, but he would have reversed and remanded the case for further proceedings without reaching plaintiff's alternative ground for affirmance. He also disagreed with the majority's method of statutory interpretation, which relied on legislative history and analyses to restrict the application of MCL 324.40111(6) to the hunting context in contravention of the clear wording of the statute.

STATUTES — NATURAL RESOURCES AND ENVIRONMENTAL PROTECTION ACT — DISCHARGE OF FIREARMS NEAR OCCUPIED BUILDINGS — SHOOTING RANGES.

The prohibition in MCL 324.40111(6) against discharging a firearm within 150 yards of certain buildings without the written permission of the owner applies only in the context of hunting and not to shooting ranges.

*Patrick, Kwiatkowski & Hesselink, PLLC* (by *Joseph P. Kwiatkowski*), for plaintiff.

*Young, Graham, Elsenheimer & Wendling, PC* (by *Bryan E. Graham*), for defendant.

Amicus Curiae:

*Michael T. Jean* for the National Rifle Association of America.

Before: RONAYNE KRAUSE, P.J., and FITZGERALD and WHITBECK, JJ.

RONAYNE KRAUSE, P.J. Defendant, the Cheboygan County Prosecuting Attorney, appeals by right an order of declaratory judgment stating that the prohibition against discharging firearms within 150 yards of occu-

pied residences in MCL 324.40111(6),[1] which is part of the Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, is inapplicable to plaintiff's shooting range. We affirm, albeit on different grounds.

The underlying facts in this matter are not in any serious dispute. Plaintiff, the Cheboygan Sportsman Club, owns and operates a shooting range for both long guns and handguns, and it has done so since approximately 1952. At the time it commenced operations, no residences were located in its vicinity. Over the years, plaintiff has improved the range and received a safety certification from the National Rifle Association (NRA). According to the Michigan Department of Licensing and Regulatory Affairs, the "Sportsman Subdivision" was platted in 1974, due north of plaintiff's shooting range, in a fairly isolated wooded area near the shore of Lake Huron. At some point—the record does not disclose when, nor can we discover it from public information of which we may take judicial notice pursuant to MRE 201—a residence was constructed on Lots 43 and 44 of the Sportsman Subdivision. That residence is within the 150-yard zone specified by MCL 324.40111(6). Only Lot 45 would have been closer to the shooting range. It appears that no other occupied structures are within 150 yards of the range.

That residence came to be owned by Roger Watts. We again do not know when, although the records available

---

[1] This provision states that "[a]n individual shall not hunt or discharge a firearm within 150 yards of an occupied building, dwelling, house, residence, or cabin, or any barn or other building used in connection with a farm operation, without obtaining the written permission of the owner, renter, or occupant of the property." At the time the trial court granted summary disposition, this subsection was located, with identical language, at MCL 324.40111(5). It was relocated to § 40111(6) by 2012 PA 340, and we will refer to its present location.

to us from the Cheboygan County Register of Deeds suggest that he may have acquired the property in 2004 or 2005. Watts was, in fact, formerly one of plaintiff's members. We note that plaintiff contends in its brief on appeal that Watts was "aware of the ranges and activities associated with the Club prior to moving to the area," a fact not explicitly stated in the record insofar as we can find. Nonetheless, it would be absurd to contend that any individual purchasing Lots 43 and 44, or building on those lots, could possibly have been unaware of the existence and nature of the shooting range at the time. It is therefore unambiguous and not seriously disputable that Watts came to the vicinity of the range, rather than the opposite. However, Watts executed a handwritten statement contending, among other things, the more recent users of the shooting range appeared no longer to appreciate the need to use "lighter" shooting loads.

On June 19, 2012, Watts reported to the Cheboygan County Sheriff Department that he had found a bullet on his property that he believed had come from plaintiff's range. The investigating officer opined that it appeared to be a nine-millimeter bullet. Although Watts allowed the bullet to be photographed, he refused to turn it over. Watts noted that this was not the first time he had found a stray bullet on his property. Further investigation determined that only one person had been shooting a handgun on the range recently, and that had been a .22 caliber pistol that was being fired in an easterly direction and not toward Watts's property, which was located to the north. The matter was turned over to the prosecutor's office, which informed plaintiff that "any individual discharging a firearm within 150 yards of a residence should face criminal prosecution for violating MCL 324.40111."

Plaintiff then commenced the instant litigation, seeking to preclude defendant from enforcing MCL 324.40111 against its members. Plaintiff asserted that, when read in context, MCL 324.40111 only prohibits a hunter from discharging a firearm within 150 yards of an occupied dwelling. The NRA, in an amicus brief, contended that even if MCL 324.40111 applied outside the context of hunting, the Cheboygan Sportsman Club was entitled to immunity from civil suit under the sport shooting ranges act, MCL 691.1541 *et seq.* The trial court agreed with the NRA's contention, ruling that the two statutes were incompatible and the latter, being the more specific, prevailed. The trial court concluded that, unless defendant could show that plaintiff did not comply with the sport shooting ranges act, defendant could not prosecute plaintiff's members. The trial court thus granted summary disposition in favor of plaintiff.

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). This Court likewise reviews de novo questions of statutory construction, with the fundamental goal of giving effect to the intent of the Legislature. *Weakland v Toledo Engineering Co, Inc*, 467 Mich 344, 347; 656 NW2d 175, amended on other grounds 468 Mich 1216 (2003). The goal of statutory interpretation is to determine and give effect to the intent of the Legislature, with the presumption that unambiguous language should be enforced as written. *Gladych v New Family Homes, Inc*, 468 Mich 594, 597; 664 NW2d 705 (2003). If the language is unambiguous, "the proper role of a court is simply to apply the terms of the statute to the circumstances in a particular case." *Veenstra v Washtenaw Country Club*, 466 Mich 155, 160; 645 NW2d 643 (2002). However, "the provisions of a statute

should be read reasonably and in context." *McCahan v Brennan*, 492 Mich 730, 739; 822 NW2d 747 (2012). Even if a trial court fails to address an issue, it is preserved for appeal and thus proper for this Court to consider if it was raised before the trial court and is pursued on appeal. *Peterman v Dep't of Natural Resources*, 446 Mich 177, 183; 521 NW2d 499 (1994).

We first conclude that the trial court erred by applying the sport shooting ranges act. It is inapposite not because it is more or less specific, but because it simply has no relevance to the facts at issue in this case. The act gives shooting ranges that "conform[] to generally accepted operation practices" several immunities. MCL 691.1542(1). In ostensibly relevant part, under MCL 691.1542, such ranges are immune to "civil liability or criminal prosecution in any matter relating to noise or noise pollution," "an action for nuisance," and an injunction against "the use or operation of a range on the basis of noise or noise pollution" if those ranges were in compliance with "any noise control laws or ordinances" to which they were subject when they commenced operation. The threatened criminal liability in the instant matter has nothing to do with noise or nuisance. Under MCL 691.1542a, such ranges are immune, under certain circumstances, to violations of ordinances. The threatened criminal liability in the instant matter involves violations of a statute, not an ordinance. In any event, plaintiff *itself* is not being threatened with any criminal liability; rather, the threat of prosecution is to any *individuals* who discharge firearms there. The sport shooting ranges act does not confer upon plaintiff any immunity relevant to this matter.

Plaintiff and amicus contend in the alternative that MCL 324.40111(6) was never intended to apply to

shooting ranges, but rather to hunters.[2] There is a considerable amount of evidentiary support for this contention in the history and context of the statute.

The first predecessor statute, MCL 312.10b, was enacted by 1968 PA 61, which amended what was then the Game Law of 1929, and it read as follows:

> (1) For the purpose of this section, "safety zone" means any area within 150 yards of any occupied dwelling house, residence, or any other building, cabin, camp or cottage when occupied by human beings or any barn or other building used in connection therewith.
>
> (2) No person, other than the owner, tenant or occupant, shall shoot or discharge any firearm or other dangerous weapon, or hunt for or shoot any wild bird or wild animal while it is within such safety zone, without the specific permission of the owner, tenant or occupant thereof.
>
> (3) The provisions of this section shall not apply to any landowner, tenant or occupant thereof or their invited guest while hunting on their own property, or to any riparian owner or their tenant or guest while shooting waterfowl lakeward over water from their upland [sic] or lakeward from a boat or blind over their submerged soil.

MCL 312.10b has only been mentioned once in any published opinion that we can find, and in that case this Court only observed what is obvious, that "the statute is intended to protect the occupants of, or animals housed in, certain structures . . . ." *Holliday v McKeiver*, 156 Mich App 214, 217; 401 NW2d 278 (1986).

However, then Michigan Attorney General Frank J. Kelley issued an opinion interpreting MCL 312.10b and concluded, in relevant part, that the Game Law was

---

[2] Our dissenting colleague would decline to address this issue because the trial court failed to do so. As noted, the trial court's failure to consider a matter that was properly raised by the parties is immaterial to whether an issue was preserved for our consideration. *Peterman*, 446 Mich at 183.

intended by the Legislature to regulate hunting and that MCL 312.10b in particular was intended to regulate "the control and limitation of the discharge of weapons in the hunting and taking of wild birds and wild game and not the discharge of weapons in target practice activities." OAG, 1981-1982, No. 5960, p 322 (August 18, 1981). Consequently, the 150-yard "safety zone" was inapplicable to landowners engaging in target practice on their own property. *Id.*[3] The statute explicitly exempted hunting activities on the landowner's own property.

Former MCL 312.10b was repealed by 1988 PA 256. See former MCL 300.269. As part of the same public act, the Legislature enacted former MCL 300.262(5), which was almost identical to the present-day MCL 324.40111(6).[4] This revised statute now reads:

---

[3] We note with interest that portions of former MCL 312.10 forbidding transportation or possession in an automobile of uncased or loaded firearms were supposedly declared unconstitutional for failing to explicitly specify that they applied only to game areas. In response, the Legislature enacted 1980 PA 451, which amended former MCL 312.10(1)(g) and (h) to explicitly "specify that the regulations covering the transportation of hunting weapons applied only in areas 'frequented by wild birds and wild animals'." House Legislative Analysis, SB 1200 and 1201, September 29, 1980; see also House Legislative Analysis, HB 4688, February 10, 1982. According to the legislative analysis, the failure to so specify caused "several courts" to find those portions of the statute unconstitutional "because their prohibitions extend beyond the purpose of the act's title, causing the law to embrace more than one object." See Const 1963, art 4, § 24. Such a holding would be consistent with a determination that the Game Act generally applied only to hunting. Unfortunately, the legislative analysis did not specify which "several" court cases so held, and we have been unable to discover them despite engaging in a diligent and exhaustive search. Criminal statutes now exist that accomplish the same purpose. See *People v Quinn*, 440 Mich 178, 191 n 16; 487 NW2d 194 (1992), citing MCL 750.227c and MCL 750.227d.

[4] Former MCL 300.262(5), which was moved without any other change to MCL 300.262(4) by 1990 PA 276, referred to "a person" rather than

An individual shall not hunt or discharge a firearm within 150 yards of an occupied building, dwelling, house, residence, or cabin, or any barn or other building used in connection with a farm operation, without obtaining the written permission of the owner, renter, or occupant of the property.

1988 PA 256 was the former Wildlife Conservation Act, MCL 300.251 *et seq.* Its title stated that its purpose was, in pertinent part, "to provide for the conservation of animals and the method and manner in which animals may be taken in this state[.]" The legislative history of 1988 PA 256 further reflects that the intention of the Legislature was essentially to recodify the Game Law of 1929, which had been amended extensively, with a less "patchwork" regime of game laws. See Senate Legislative Analysis, SB 374, July 12, 1988.

The Natural Resources and Environmental Protection Act (NREPA), MCL 324.101 *et seq.*, was enacted by 1994 PA 451. Its title provided that it was

to protect the environment and natural resources of the state; to codify, revise, consolidate, and classify laws relating to the environment and natural resources of the state; to regulate the discharge of certain substances into the environment; to regulate the use of certain lands, waters, and other natural resources of the state; to prescribe the powers and duties of certain state and local agencies and officials; to provide for certain charges, fees, and assessments; to prescribe penalties and provide remedies; to repeal certain parts of this act on a specific date; and to repeal certain acts and parts of acts.

---

"an individual" and lacked a comma after the words "farm operation." Although changes to a statute are often presumed to change its meaning, we think it obvious that these two changes were at most intended merely as clarification. See *Detroit Edison Co v Janosz*, 350 Mich 606, 614; 87 NW2d 126 (1957). Consequently, we will in the remainder of this opinion treat these two minor differences as being effectively nonexistent.

Shortly thereafter, the Legislature enacted a series of public acts recodifying a long list of "current natural resources management statutes concerning wildlife conservation, recreation, habitat protection, and environmental issues" by "inserting them into the NREPA." Senate Legislative Analysis, HB 4348 through 4351 and 4385, April 6, 1995. Among many other provisions, 1995 PA 57 recodified 1988 PA 256 as Part 401 of NREPA, under "wildlife conservation." See *id.* Thus, MCL 300.262(4) became MCL 324.40111(4), which is now at MCL 324.40111(6) with irrelevant changes.[5]

It has always been the law that statutes must be construed in such a way as to reflect the intention of the Legislature as derived from a strict reading of the language of the statute at issue, but at the same time, that language must not be "construed so strictly as to defeat the obvious intention of the legislature." *United States v Wiltberger*, 18 US (5 Wheat) 76, 95; 5 L Ed 37 (1820). As noted, "the provisions of a statute should be read reasonably and in context," *McCahan*, 492 Mich at 739, particularly "in the context of the entire legislative scheme," *Madugula v Taub*, 496 Mich 685, 696; 853 NW2d 75 (2014). Part of that context is the titles of their acts, and they may not exceed the scope of those titles. *Bankhead v River Rouge Mayor*, 387 Mich 610, 613-615; 198 NW2d 414 (1972), relying on Const 1963, art 4, § 24. Further context is any other statutes that are *in pari materia*, relating to the same common purpose, which should be read together. See *Apsey v Mem Hosp*, 477 Mich 120, 129 n 4; 730 NW2d 695 (2007). An act's title is not itself authority of any sort, but it is properly considered to assist in determining the act's purpose and scope. *Malcolm v East Detroit*, 437

---

[5] See note 4 of this opinion.

Mich 132, 143; 468 NW2d 479 (1991). Although legislative analyses are of very little value in reading a statute, they have some value to courts as casting light on the reasons that the Legislature may have had and the meaning they intended for an act. *Kinder Morgan Mich, LLC v City of Jackson*, 277 Mich App 159, 170; 744 NW2d 184 (2007).

Our dissenting colleague takes issue with our approach to understanding MCL 324.40111(6). To some extent, we can appreciate our colleague's concerns: in particular, we agree that if MCL 324.40111(6) is read strictly in isolation, that provision does not itself provide any exceptions for hunting on one's own property. It is true that "or" is a disjunctive term, and were we to consider the statute without regard to its history or its surrounding statutory framework, our colleague's conclusion would be inescapable. However, as discussed, statutory provisions must be read in context, which we do not believe constitutes "ignoring" any portion thereof. Beyond that, our colleague's exegesis of legislative analysis is an impressive academic exercise. We do not share our colleague's willingness to depart from established precedent that recognizes that collective entities can be, through simple and well-understood principles of group dynamics, effectively discrete entities unto themselves and subject to analysis in their own right. We decline to depart from that precedent.

Were we to disregard any established legal principle that could conceivably be thought of—inaccurately in this case, we believe—as a "fiction," the result would be chaos. In any event, we also decline to adopt our colleague's approach of analyzing MCL 324.40111(6) divorced from its context. Considering statutes in the contexts of the remainder of any cohesive statutory provisions of which they are a part and of their history

is also a cherished principle of statutory analysis. *Robinson v City of Lansing*, 486 Mich 1, 15-16; 782 NW2d 171 (2010); *Arrowhead Development Co v Livingston Co Road Comm*, 413 Mich 505, 516; 322 NW2d 702 (1982). Ultimately, the goal of *all* such principles is to determine the intent of the Legislature, and an overly mechanical application of such principles can be counterproductive. See *Dagenhardt v Special Machine & Engineering, Inc*, 418 Mich 520, 544 n 24; 345 NW2d 164 (1984). We prefer an organic approach to what is really an organic challenge.

It is inescapable that MCL 324.40111 is part of NREPA, and for the entire history of it and its predecessors the relevant provision has been a small part of a large statutory framework governing hunting, which successively came to be incorporated into increasingly larger statutory frameworks governing natural resources of all kinds. It has never been part of a general penal statutory framework or a framework governing firearms. Under MCL 324.40118(1), which makes violation of MCL 324.40111 a misdemeanor, any issued permit is also to be revoked, further indicating that the statute at issue is part of a hunting regulation scheme. We are of the opinion, as was Attorney General Frank J. Kelley regarding the predecessor statute, that the context of MCL 324.40111 is an inextricable part thereof. Furthermore, although changes to a statute are presumed to reflect an intention to change meaning, that presumption is not a strong one and will not overcome other indications to the contrary. See *People v Harrison*, 194 Mich 363, 370; 160 NW 623 (1916). In this case, it is clear that every relevant change made to the statute since its inception was for the purpose of recodification or streamlining.

In short, we are convinced that the 1981 opinion of Attorney General Frank J. Kelley regarding former MCL 312.10b was correct at the time and continues to be correct regarding the modern version thereof, MCL 324.40111: "The focus of this section is the hunting and taking of wild birds and wild animals" and it was intended to "control and limit[] . . . the discharge of weapons in the hunting and taking of wild birds and wild game and not the discharge of weapons in target practice activities."[6] We note also that although courts cannot consider the wisdom, fairness, or sensibility of a statute when evaluating its meaning, we believe any other conclusion would be not only somewhat nonsensical given the statute's inclusion in NREPA, but also deeply unjust to a business and individuals who have apparently undertaken to comply with the law and whose actions would become illegal *because of the unilateral act of someone else who was entirely aware of plaintiff's activities and even participated therein.* Put simply, it shocks our sense of fundamental fairness for the Legislature to have effectively handed Watts the sole power to decide whether plaintiff and its members could continue their historical use of their property the moment he became tired of their doing so. In conclusion, although the trial court erred by finding the sport shooting ranges act applicable, the trial court correctly found plaintiff and its members immune from prosecution for violating MCL 324.40111 under the facts alleged.

We emphasize that our holding today does *not* immunize property owners from potential criminal or civil liability for discharging firearms on their own property

---

[6] OAG, 1981-1982 at 322. Our Court has held that "while not binding on this Court, [Attorney General opinions] can be persuasive authority." *People v Woolfolk*, 304 Mich App 450, 492; 848 NW2d 169 (2014).

merely because the discharge was for some purpose other than hunting. For example, the letter written by the Cheboygan County Prosecuting Attorney regarding plaintiff referred not only to MCL 324.40111 but also to the possibility of criminal liability for recklessly discharging a firearm contrary to MCL 752.863a, a general penal statute. The latter statute was not made a part of the instant litigation, and we have not been asked to render an opinion as to its possible applicability to the facts at bar, so we do not. However, we do note that nothing in our opinion today necessarily precludes a potential criminal proceeding against any of plaintiff's members, or indeed any other person, under that or any other statute we have not explicitly discussed. We hold *only* that MCL 324.40111 applies to hunting contexts and not to target practice contexts, so the act of conducting target practice shooting on plaintiff's premises does not violate MCL 324.40111. We express no opinion, and none should be implied, as to whether any of the activities on plaintiff's premises are either permitted or prohibited by any other statute or law.

Affirmed.

Fitzgerald, J., concurred with Ronayne Krause, P.J.

Whitbeck, J. (*concurring in part and dissenting in part*). I agree that the trial court erred by applying MCL 691.1541 *et seq.* (the "Sport Shooting Ranges Act"). The majority has ably stated the background facts and procedural history in this case, and I agree that the Sport Shooting Ranges Act does not confer immunity in this case because this case does not concern an issue of noise control or noise pollution.

However, I write separately because I would not address Cheboygan Sportsman Club's alternative

ground for affirmance and because I strongly disagree with the majority's method of statutory interpretation to determine that issue. Accordingly, I dissent from that portion of the majority's opinion. I would reverse and remand for further proceedings.

I. THE SPORT SHOOTING RANGES ACT AND IMMUNITY

A. THE SPORT SHOOTING RANGES ACT

The Legislature originally enacted the Sport Shooting Ranges Act in 1989, in response to the conflicts that the development of rural areas created between shooting ranges and new neighbors.[1] The Sport Shooting Ranges Act provides "various forms of protection to shooting ranges, including providing immunity from certain nuisance actions to shooting ranges that comply with generally accepted operation practices."[2] The Sport Shooting Ranges Act specifically provides civil and criminal immunity from prosecution or nuisance actions involving noise control or noise pollution laws or ordinances:

> Notwithstanding any other provision of law, and in addition to other protections provided in this act, a person who owns or operates or uses a sport shooting range that conforms to generally accepted operation practices in this state *is not subject to civil liability or criminal prosecution in any matter relating to noise or noise pollution* resulting from the operation or use of the range if the range is in compliance with any noise control laws or ordinances that applied to the range and its operation at the time of construction or initial operation of the range.[3]

---

[1] *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 727; 575 NW2d 63 (1997).

[2] *Id.*

[3] MCL 691.1542(1) (emphasis added).

### B. THE WILDLIFE CONSERVATION ACT

The Wildlife Conservation Act provides the authority under which the Department of Natural Resources regulates the taking of game animals.[4] The Wildlife Conservation Act provides in part that "[a]n individual shall not hunt or discharge a firearm within 150 yards of an occupied building . . . without obtaining the written permission of the owner, renter, or occupant of the property."[5]

### C. APPLICATION OF THE SPORT SHOOTING RANGES ACT

The prosecutor contends that the trial court erred by concluding that the Sport Shooting Ranges Act applied here because this matter does not concern noise or noise pollution. I agree.

The trial court concluded that the more specific Sport Shooting Ranges Act took precedence over the Wildlife Conservation Act because both statutes involve the discharge of firearms, and thus both were applicable in this case. However, the Sport Shooting Ranges Act provides shooting ranges immunity against noise complaints. This case does not involve noise complaints. It requires a determination of whether a prohibition against discharging a firearm within 150 yards of an occupied building is an issue of public safety or a hunting regulation under the Wildlife Conservation Act. Neither party's argument concerns noise or noise pollution. Thus, this suit is plainly not a matter "relating to noise or noise pollution," and the Sport Shooting Ranges Act does not apply. The trial court erred when it determined that the Cheboygan Sportsman Club was entitled to immunity from civil suit under the Sport Shooting Ranges Act.

---

[4] MCL 324.40105.

[5] MCL 324.40111(6).

I would therefore conclude that the trial court erred when it determined that the Cheboygan Sportsman Club was entitled to immunity from prosecution under the Sport Shooting Ranges Act because this action does not involve noise or noise pollution. I would reverse and remand on this ground.

## II. APPLICATION OF THE WILDLIFE CONSERVATION ACT

### A. OVERVIEW

As an alternative ground for affirmance, the Cheboygan Sportsman Club contends that the Wildlife Conservation Act does not apply because, when read in context, the statute limits only the discharge of firearms related to hunting, not range shooting. The prosecutor responds that the plain language of the provision at issue is not that specific in scope, and prohibits anyone from discharging a firearm within 150 yards of an occupied building. I note that, while the Cheboygan Sportsman Club made this argument below, the trial court failed to address it and it is not the focus of the parties' briefs on appeal.

For these reasons, and although the issue is purely legal in nature, I would decline to interpret the Wildlife Conservation Act. However, because the majority chooses to address the interpretation of Wildlife Conservation Act, I will also address the issue in order to dissent from the majority's method of interpretation.

### B. LEGAL STANDARDS OF STATUTORY INTERPRETATION

We in the legal profession hold firm to the belief, to the point of reducing the words to a cliché, that the primary and overriding rule of statutory interpretation is that our goal is to give effect to the intent of the

Legislature.[6] At the risk of being labelled a judicial heretic, I must say that I have often found the repeated incantation of this hoary formula to be more than a little at odds with reality. The basic premise of the formula is that there is some objective, collective legislative intent that is capable of being ascertained through rational analysis.

But is this really true? Certainly, when a bill passes the Legislature, that passage is the result of collective action by both houses of that Legislature. But in each house, that *collective* action is itself the result of the *individual* actions of *individual* legislators, each casting his or her own vote. And that individual legislator may cast his or her vote for a very, very wide variety of reasons. For example:

• The legislator and his or her staff may analyze the bill carefully and reach a conclusion about the proper way to cast his or her vote. I have no doubt that that this frequently occurs.

• But the legislator may also vote aye or nay for reasons of party loyalty; the legislator's caucus may have taken a position on the bill and the legislator may vote in concert with that caucus position without a great deal of further analysis.

• Or the legislator may perceive that an important constituency favors or opposes the bill and may vote accordingly.

• Or the language of the bill may be the product of amendment and compromise and the legislator, while having considerable doubts about the wording in one portion of the bill, may nevertheless strongly favor the

---

[6] See, for example, *US Fidelity & Guaranty Co v Mich Catastrophic Claims Ass'n (On Rehearing)*, 484 Mich 1, 13; 795 NW2d 101 (2009).

provisions of another portion and may vote for the bill despite having reservations about some of its provisions.

• Or the legislator may simply follow the lead of another legislator who is a recognized authority—such as a committee chair or a ranking member—in the particular area of the law with which the bill deals.

• Or, finally, the legislator may think that the bill is unimportant and vote for it just as a means of clearing the deck for other legislation in which he or she may be more interested.

My point is a simple one: the legislative process is almost infinitely complex and the reasons for an individual legislator's vote on a particular piece of legislation can be almost infinitely variable. To suppose that a *collective* intent somehow arises out of this welter of varied individual motives is to elevate fiction over reality. It may be a useful fiction—perhaps even a necessary fiction—but it is a fiction nonetheless.

To assist us in dealing with this fiction, we have developed over the years certain conventions designed to lead us to legislative intent. Statutes provide some of these rules. For instance, MCL 8.3a provides that common words and phrases should be construed according to common meanings while technical words and phrases should be construed according to their particular meanings, and MCL 8.4b provides that catchline headings are not part of a statute.

The judiciary has created other rules of statutory interpretation, some of which have their basis in logic. For instance, when the Legislature includes language in one part of a statute that it omits in another, we make the logical assumption that the omission was inten-

tional.[7] Similarly, we make the equally logical assumption that a more recent statute has precedence over an older statute.[8]

Other rules have their basis in grammar. For instance, we conclude that the Legislature's use of the present perfect tense indicates that an action was started in the past and continues or has been recently completed,[9] and that a modifying clause modifies only the last antecedent clause.[10]

As I stated earlier, this Court and the Michigan Supreme Court state, endlessly and perhaps even liturgically, that our goal is simply to give effect to the intent of the Legislature.[11] Again, this presumes a collective intent when, as I suggest, no such collective intent may exist. But—fortunately and perhaps because we know we are not really Galahads searching for the Holy Grail of collective legislative intent—we often follow that statement with a qualifier: the language of the *statute itself* is the primary indication of the Legislature's intent.[12] Thus, I suggest the statement that we are actually searching for a "statutory purpose" that we can glean from the words expressing that purpose is a better expression of what courts do than relying on the catchphrase of "legislative intent."

But whatever label we use—and I acknowledge that the concept of legislative intent is firmly embedded in

---

[7] See *People v Peltola*, 489 Mich 174, 185; 803 NW2d 140 (2011).

[8] See *Malcolm v East Detroit*, 437 Mich 132, 139; 468 NW2d 479 (1991); *Parise v Detroit Entertainment*, 295 Mich App 25, 28; 811 NW2d 98 (2011).

[9] See *People v Kolanek*, 491 Mich 382, 407; 817 NW2d 528 (2012).

[10] See *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999).

[11] See *US Fidelity & Guaranty Co*, 484 Mich at 13.

[12] *Id.* at 13.

our jurisprudence—the problem lies in how we express the concept rather than how we apply it. Michigan courts have consistently stated that if the plain and ordinary meaning of a statute's language is clear, we will not engage in judicial construction.[13] If the statute's language is unambiguous, we must enforce the statute as written.[14]

### C. INTERPRETATION OF THE WILDLIFE CONSERVATION ACT

In very simple language, the Wildlife Conservation Act prohibits hunting *or* discharging a firearm within 150 yards of an occupied building:

> An individual shall not hunt *or* discharge a firearm within 150 yards of an occupied building, dwelling, house, residence, or cabin, or any barn or other building used in connection with a farm operation, without obtaining the written permission of the owner, renter, or occupant of the property.[15]

The majority uses the statute's title, legislative history, and legislative analyses to reach the conclusion that this statute does not mean what it says, but rather only means that a person may not discharge a firearm within 150 yards of an occupied building *while hunting.* Indeed, the majority's very statement of the case—that this matter involves a declaratory judgment holding that the "prohibition against discharging firearms within 150 yards of occupied residences . . . is inapplicable to plaintiff's shooting range"—illustrates the fundamental problem here. The statute does not simply prohibit discharging a firearm within 150 yards of an occupied building. It prohibits hunting *or* discharging a

---

[13] *Id.* at 12.

[14] *Id.* at 13.

[15] MCL 324.40111(6) (emphasis added).

firearm in such a fashion. By changing the word "or" to the word "and"—and this is exactly what the majority's interpretation does—the majority is able to affirm the trial court's holding that the Wildlife Conservation Act is inapplicable to the Cheboygan Sportsman Club.

This interpretation runs afoul of a number of the conventions—those basic and time-honored rules of statutory interpretation—that we by necessity follow when we pursue the chimera of collective legislative intent.

Here, as I have noted, the statute provides that an individual may not "hunt *or* discharge a firearm within 150 yards of an occupied building . . . ." The Michigan Supreme Court has very recently emphasized that this Court may not ignore statutory language in favor of a more "reasonable" interpretation:

It is well established that

"[w]e have no authority to treat any part of a legislative enactment, which is not ambiguous in itself and is capable of reasonable application, as so far unimportant that it is a matter of indifference whether it is complied with or not. We must suppose the legislature saw sufficient reason for its adoption, and meant it to have effect; and whether the reason is apparent to our minds or not, we have no discretion to dispense with a compliance with the statute."[16]

That the statute appears to be inconvenient, unnecessary, or unwise is not a reason for this Court to avoid the application of plain statutory language.[17] The word "or" is a disjunctive term that causes the statute to prohibit

---

[16] *In re Bail Bond Forfeiture*, 496 Mich 320, 336; 852 NW2d 747 (2014), quoting *Hoyt v East Saginaw*, 19 Mich 39, 46 (1869).

[17] *Johnson v Recca*, 492 Mich 169, 187; 821 NW2d 520 (2012); *Mich Basic Prop Ins Ass'n v Office of Fin & Ins Regulation*, 288 Mich App 552, 560; 808 NW2d 456 (2010).

*either* action.[18] Generally, this Court should follow the literal use of the term "or" unless it renders the statute dubious.[19]

In this case, the word "or" does not render the statute dubious. Accordingly, there is no reason to avoid giving effect to the word "or." Were we to give effect to the word "or," it would prohibit both actions— hunting *or* discharging a firearm within 150 yards of an occupied building—not merely hunting. Contrary to the majority's holding, therefore, such an interpretation would mean that the Wildlife Conservation Act is applicable to the Cheboygan Sportsman Club's shooting range and prohibits target shooting on that range.

This distinction also illuminates how the majority's opinion runs afoul of another of our cherished conventions: that courts must avoid interpretations that render parts of a statute surplusage.[20] By failing to interpret the word "or" as a disjunctive term, the majority limits the application of the Wildlife Conservation Act only to hunting, and not to discharging a firearm. The majority's interpretation thus renders "discharging a firearm" surplusage.

And, by limiting the application of the Wildlife Conservation Act to "hunting contexts and not to target practice contexts," the majority's interpretation runs afoul of yet another basic rule of statutory interpretation: that this Court may not read provisions into a

---

[18] *State of Michigan v McQueen*, 293 Mich App 644, 671; 811 NW2d 513 (2011); *People v Kowalski*, 489 Mich 488, 499; 803 NW2d 200 (2011).

[19] *Root v Ins Co of North America*, 214 Mich App 106, 109; 542 NW2d 318 (1995).

[20] *Baker v Gen Motors Corp*, 409 Mich 639, 665; 297 NW2d 387 (1980); *Johnson*, 492 Mich at 177.

statute that the Legislature chose to omit.[21] The statute does not provide any exception for target shooting on one's own property. The majority instead creates one. But had the Legislature wished to create such an exception, it could have done so. It did not create such an exception, and this Court should not read such an exception into an unambiguous statute.

In creating this exception, the majority's reliance on legislative history and legislative analyses is most troubling. The Michigan Supreme Court has expressed disapproval of reliance on legislative analyses in the past, particularly when it creates a conflict with an unambiguous statute's plain language.[22] In no uncertain terms, the Court stated that, "In Michigan, a legislative analysis is a feeble indicator of legislative intent and is therefore a generally unpersuasive tool of statutory construction."[23] As the Court has noted, a legislative analysis does not necessarily reflect the view of the Legislature:

> The problem with relying on bill analyses is that they do not necessarily represent the views of even a single legislator. Rather, they are prepared by House and Senate staff. Indeed, the analyses themselves note that they do not constitute an official statement of legislative intent.[24]

There is no reason in the language of the statute itself to ignore the placement and use of the word "or" between the phrases "hunt" and "discharge a firearm." This Court should *particularly* not rely on legislative analyses to do so. Rather clearly, we are simply not free

---

[21] See *In re Hurd-Marvin Drain*, 331 Mich 504, 509; 50 NW2d 143 (1951); *Mich Basic Prop Ins Ass'n*, 288 Mich App at 560.

[22] *People v Davis*, 468 Mich 77, 79 n 1; 658 NW2d 800 (2003).

[23] *Frank W Lynch & Co v Flex Technologies, Inc*, 463 Mich 578, 587; 624 NW2d 180 (2001).

[24] *Id.* at 587 n 7.

to ignore the plain language of the statute and create an exception to remake the statute into a form we find more reasonable.

### III. RESPONSE TO THE MAJORITY'S COMMENTS

The majority makes several comments in its opinion to which I am obligated to respond. First, the majority asserts that we must read statutes "in context." I take this to mean that we are obliged to consider not only the "surrounding statutory framework" but also legislative history and, presumably, legislative analyses. But if I am right, or mostly right, about the dubious nature of the concept of a collective legislative intent, then this context is conceptually irrelevant. And I note that I am not alone in this critique; see Justice Antonin Scalia's comment that "with respect to 99.99 percent of the issues of construction reaching the courts, there *is* no legislative intent, so that any clues provided by the legislative history are bound to be false."[25]

Second, the majority categorizes my analysis in this dissent as "an impressive academic exercise." I appreciate the kind words. But I do not regard my analysis to be at all academic in nature. Rather, I suggest, it is grounded in practical reality. Only the most innocent observer would conclude that the chaos that occurs in the rotunda of the Capitol on the last day of a legislative session—with bills flying from one chamber to the other, with every available arm being twisted and every possible political chit being called in, with compromises being made and then unmade within a matter of minutes—is capable of producing a rational and understandable collective legislative intent as to each indi-

---

[25] Scalia, *A Matter of Interpretation* (Princeton: Princeton University Press, 1997), p 32.

vidual piece of legislation. This is not an academic observation; it reflects reality as I have seen it.

Third, the majority states, "Were we to disregard any established legal principle that could conceivably be thought of—inaccurately in this case, we believe—as a 'fiction,' the result would be chaos." I am not a proponent of chaos, nor do I propose to disregard established legal principles. Rather, my critique of the majority's approach is that it disregards time-honored principles of statutory construction to reach a result contrary to the actual words of the statute construed according to such principles.

Finally, the majority states, "We prefer an organic approach to what is really an organic challenge."[26] I am not certain that I understand what this sentence means. But if it means that the word "or" in a statute actually means "and" when considered organically, I obviously disagree.

### IV. CONCLUSION

I agree with the majority that the trial court erred when it determined that the Cheboygan Sportsman Club was entitled to immunity from prosecution under the Sport Shooting Ranges Act because this action does not involve noise or noise pollution. On that basis, I would reverse and remand for further proceedings.

But I would not graft an interpretation onto the Wildlife Conservation Act (1) that suggests that a person may not discharge a firearm within 150 yards of an occupied building *while hunting*, (2) that thereby

---

[26] See, similarly, the majority's statement, "We do not share our colleague's willingness to depart from established precedent that recognizes that collective entities can be, through simple and well-understood principles of group dynamics, effectively discrete entities unto themselves and subject to analysis in their own right."

limits the application of the Wildlife Conservation Act only to hunting, and not to discharging a firearm, rendering the "discharging a firearm" language of the statute surplusage, (3) that reads provisions into the statute that the Legislature chose to omit, and (4) that relies on the exceedingly frail reeds of legislative history and legislative analyses to reach this result.

The majority states, "We hold *only* that MCL 324.40111 [the Wildlife Conservation Act] applies to hunting contexts and not to target practice contexts, so the act of conducting target practice shooting on [Cheboygan Sportsman Club's] premises does not violate MCL 324.40111." Actually, the majority's opinion is simply that the Wildlife Conservation Act applies *only* to hunting and *therefore* target practice shooting is not prohibited. The clear wording of the statute is otherwise. I therefore respectfully dissent from the majority's method of interpretation of the Wildlife Conservation Act.